May we see the court recall the next case Mr. Walker, you may proceed. May it please the court, counsel. Good afternoon, your honors. My name is Lucas Walker with the State Appellate Defender's Office. I represent the defendant, Mr. Terrence Tuson. Your honors, there's only one issue in this case, and that is that the trial court erred where it denied Mr. Tuson's motion to suppress statements. We argue, your honors, that the statement given at the Peoria Police Station should have been suppressed because that statement was involuntary. The rules here are well established. Statements have to be voluntary. They cannot be induced through promises of governmental immunity, no matter how slight or indirect those promises may be. Miranda warnings and Miranda waivers do not make statements, per se, voluntary. Rather, courts look to the totality of the circumstances when making that determination. Here, your honors, Mr. Tuson entered into a federal use immunity agreement in which he agreed that he would inform the government of any crimes he had knowledge of, any criminal activity he had participated in or had knowledge of. And the federal government promised they would not use that information directly against him in a criminal case. The first statement in relation to that agreement, your honors, occurred at the federal courthouse where Mr. Tuson spoke with a federal agent Hoffman. And federal agent Hoffman testified that Mr. Tuson gave him a statement regarding a Peoria murder and that he believed Mr. Tuson may have incriminated himself because he had said he was a witness to the crime and had a weapon at the time. While agent Hoffman passed that information along to Peoria officer Curry, and a couple weeks later, agent Hoffman and Peoria officer Curry picked up Mr. Tuson in the River West area of Peoria and drove him back to the Peoria police station. Just to be specific, Mr. Tuson, the defendant, drove back with agent Hoffman with Peoria police officer Curry traveling behind in a separate vehicle. Once they're at the Peoria police station, as is evidenced in the video in the record, Mr. Tuson is Mirandized. He agrees to speak. But crucially in this argument, your honors, is that after that, he expresses confusion, expresses a belief that he has immunity by saying, now me being here is not going to hurt me, will it? And in response to that, there's not silence, there's no clarification, but rather federal agent Hoffman says he has to get the full story just like you told me. So upon hearing that, Mr. Tuson then of course proceeds to give his full statement, which obviously was used against him in the court here where he was found guilty. Mr. Tuson did try to suppress that statement, arguing that it was involuntary, but the trial court denied that motion, finding that the statement was voluntary, but the trial court did find that Mr. Tuson believed he was immune. Here, your honors, we really focus on a case called People v. Arkbauer. And in People v. Arkbauer, it's a very similar set of facts. The defendant in People v. Arkbauer entered into an agreement with the Macon County State's Attorney that he would cooperate with him to assist in apprehending the main suspect in a murder case. And the Macon County State's Attorney agreed not to prosecute him for the statements he made in doing that. The defendant worked with the Macon County State's Attorney, and in doing so, had several discussions with the Illinois State Police. During those discussions, he was Mirandized multiple times. He agreed to speak, but just like this case, expressed confusion about that, saying, you know, to the extent, essentially saying, wait, I have immunity. And in response to that, the Illinois State Police investigators would say, typically, well, this is just a formal procedure. Or, in one event at least, he was told, well, that was Macon County, but this is a different investigation. Because without getting too deep into the facts in Arkbauer, the main suspect of the murder case there was eventually killed in a shootout. Ultimately, the Macon County prosecutors did not go after the defendant, did not go after the original suspect, because he was dead. But the Shelby County State's Attorney, where some of the offenses had occurred as well, Shelby County State's Attorney decided to prosecute the defendant for similar charges that he could have been susceptible to in Macon County. And they wanted to use all these statements that he gave to the Illinois State Police investigators. Well, obviously, Mr. Arkbauer moved to suppress those statements, and the trial court agreed those statements were involuntary. The appellate court affirmed. And the appellate court affirmed really based on three factors that we argue are present here. And there was a fourth element of that case we want to focus on as well. But the three factors were, number one, all the statements given by Mr. Arkbauer in that case dealt with the same ongoing murder investigation, contemplated by the agreement with Macon County. The second factor was that there was a continuity of agents, and that he spoke with these Illinois State Police investigators. Not all the same ones, but generally Illinois State Police investigators. And the third and most important factor was that Mr. Arkbauer was never disabused of his obvious belief that he was immune. Now, we argue those factors are present here, and we'll trace that right now. Well, let me just ask you one question on that. Yes, Your Honor. Is this immunity agreement he had with the feds, was it specifically with respect to this murder? It was not specifically to one offense, no. This was a bit more of a broad agreement where the language was essentially, Tussin had to agree to provide information that he had of any crime that he had knowledge of or had participated in. And in exchange, the federal government would promise not to use that information against him directly in a criminal case or at sentencing. The hopes, of course, based on the record was that Mr. Tussin would achieve a reduced sentence in another case he had on the federal level. But it was more broad, and that goes right to the first element here as far as the Arkbauer factors. And that is that all the discussions had here dealt with the same Peoria murder investigation, and it was contemplated by the agreement where, as we've just discussed, the agreement was that Mr. Tussin would provide all information he had regarding any crime that he had participated in or had knowledge of. The second factor, continuity of agents. This was clearly present as well, Your Honors. Now, it's not that Federal Agent Hoffman was a Peoria police officer, but Federal Agent Hoffman quite literally delivered Mr. Tussin to the Peoria police. It was the bridge, really. He was the bridge, really, between these two discussions. And so essentially, Federal Agent Hoffman was at the first statement, and Federal Agent Hoffman was at the second. And finally, the most important factor, and that is that Mr. Tussin was never disabused of his obvious belief that he was immune. And this is crucial here. This would be a completely different case if Mr. Tussin had not expressed confusion and if Federal Agent Hoffman had not, in response to that confusion. And we want to note, Federal Agent Hoffman made it clear at the suppression hearing that he took the first statement, he was aware of the immunity agreement, and that he believed Mr. Tussin may have incriminated himself. Let me ask one other question. This immunity agreement, was it entered into before or after the murder for which the defendant was convicted? It was entered into before. So he could believe that because I got this immunity agreement, I can go out and kill people and confess to it not being immune? No, Your Honors, part of our argument is that, again, given his totality of the circumstances, he had a reasonable belief that he was immune. Now, and that goes to, as to the totality of the circumstances, Mr. Tussin had expressed to his federal attorney that he had information about a murder. But he just witnessed it. He didn't participate in it. He had no idea that he was susceptible to prosecution through the application of accountability theory here. And moreover, the real crux of this argument, Your Honors, is that he could reasonably rely on, rather, when the federal agent looked at Mr. Tussin in response to his question, leaving here is not going to hurt me, will it? And instead of silence and instead of a clarification, he says, you have to give him the full story like you told me. Well, he's going to reasonably believe that the federal agent is not going to actively urge him to give a statement that would incriminate himself and potentially violate the federal agreement and be used against him indirectly in a criminal case. All of these factors combined, we want to stress, it's a very fact-heavy argument. But those facts are present, those three factors of all the statements dealt with the same ongoing murder investigation, there was a continuity of agents, and he was never disabused of his obvious belief that he was immune. Now, the fourth element of Art Bauer we want to make sure we stress is because the state does argue, well, you know, this wasn't binding on the state. And they're right. The federal agreement did not bind the state. But that doesn't matter because this is the totality of the circumstances analysis. And as made clear in Art Bauer, the Macon County agreement didn't bind Shelby County. There was nothing stopping Shelby County from prosecuting the defendant in Art Bauer, but they could not use those statements because those statements were involuntary. But in Art Bauer, these were statements made about the same investigation, which was the subject of the immunity agreement, correct? Yes, that agreement was specific to, not so much specific to a certain offense, but to a certain investigation. In this case, we're talking about a murder that was committed after the immunity agreement was entered into. That's correct. But the three factors are still here, and we would stress that. And that is that, number one, all these statements dealt with the same ongoing murder investigation, and it was contemplated by the agreement where the agreement provided that he could provide all this information regarding any criminal offense, and in exchange it would not be used directly against him in the criminal case. So it was contemplated by the agreement, but that's not the only factor. Then comes, there's a continuity of agents, where he was quite literally delivered by a federal agent to the Peoria police officer and told he has to get the full story like you told me, and that was in response to a question of an obvious, well, asking essentially, I'm immune here, right? And instead of clarifying that, say, no, he has to get the full story. Well, obviously he's going to believe that that federal agent who knows about the agreement is not going to actively urge him to give a statement that could potentially violate the federal agreement and be used directly in a criminal case. Well, and isn't there an argument that even if this had been somehow in the federal jurisdiction on this murder because it happened after the agreement, that he wasn't even immune from federal prosecution because he committed a crime after entering into the agreement? Well, our point there, Your Honors, would be, and the state acknowledges this in its brief, we pointed out as well, there has to be a judicial determination of a breach. In other words, the government does not unilaterally decide that the agreement is now breached and void. Well, do you think it's good public policy for federal law enforcement agents to go out and enter into agreements with people and say, now, you can go out and kill everybody you want, but if you help us with this over here, you're immune? Well, I don't think that's what we're arguing, Your Honors. I think what we're arguing is that that's the – Where that would go, I realize that we're arguing. Okay. I don't believe that that's really what – I don't think Mr. Tussin here thought, well, now that I have this agreement, I can murder people at will. I don't think that's what he thought. I don't think he thought he committed murder, where he didn't fire a shot and was just present with a handgun. So I don't think that's really what occurred here in his mind. I don't think that was the effect of this agreement where Mr. Tussin thought, well, now I can murder people and get away with it and help myself out. I don't think that was what occurred. And speaking of public policy, I do want to point out in response to that, these are very valid tools. These use immunity agreements, all these types of agreements, are very valid tools a state can use. And the integrity of these agreements needs to be protected. Word gets out, well, he had an agreement with the federal government, and they hand-delivered him to the state and told him you have to tell him the story, and next thing he's in prison until he's 86. Well, wasn't part of the agreement was, and from this point on, son, you're going to keep your nose clean? Well, there's no doubt, Your Honor, that there was a potential breach here. There's no doubt. But again, the government doesn't unilaterally decide that this agreement is now breached and void. The most minimum amount of due process would at least require notice to be given to Mr. Tussin that we think you're in violation of this, there's going to be an evidentiary hearing. That's well established, as pointed out in the state's brief and in ours. So the argument can't be, well, we know you violated this, so we can go ahead and do this. It has to be an evidentiary. Well, ultimately, a judge decided it, right? Well, but obviously, a breach of an agreement is going to have to include all the parties subject to that agreement. This was an agreement between the U.S. Attorney's federal government and Mr. Tussin. So they would have to be parties to the agreement, to the evidentiary hearing, if there's going to be a discussion on a breach.  Mr. Tussin did have a reasonable belief, given all the circumstances here, that he was immune, and the statement was involuntary, just like in Arc Bauer. And again, I want to point out, again, we'll stress, just to make sure it's covered fully, it doesn't matter that the federal government used an immunity agreement to not bind the state. What matters here is whether the statement was voluntary or involuntary, given the totality of the circumstances. And the circumstances present in Arc Bauer are present here, except to a higher degree. Because in Arc Bauer, in response to the confusion regarding the brandizing, was, well, this is a formal policy procedure, or that was Macon County, this is something different. Here, he was literally told, you have to tell him the full story like you told me. But he was also told by Peoria Police Officer Curry, like in Arc Bauer, that was the federal government, this is the states, it works differently. Ultimately, based on Arc Bauer, this statement was involuntary and should have been suppressed. Essentially, your honors, that's our main argument. Now, we did move to cite traditional authority, people of east of Penske, a recent Illinois Supreme Court case. I understand. And we really just, and we did give notice to opposing counsel, I believe that was October 13th, it came out October 8th. We really decided today, your honors, to provide more support for the proposition that agreements that don't bind the state don't necessarily mean defendants can't rely upon them. In that case, of course, the police officers made an agreement with the defendant in regards to a possession of a controlled substance charge, saying, if you work with us, you won't be charged with that. He worked with them, he was charged with that, and that statement, I'm sorry, that charge was ultimately dismissed, the Illinois Supreme Court finding, even an unauthorized promise, even an unauthorized promise can be relied upon by a defendant on due process grounds where constitutional concerns arise. So even if an unauthorized promise can be relied upon, I mean, I don't think anyone's arguing here that the Federal Abuse Immunity Agreement was an unauthorized agreement. So given the totality of the circumstances here, we argue, your honors, that the statement was involuntary, it should have been suppressed, and our requested relief is that this court reverse the trial court's denial of the motion to suppress and reverse his convictions and remand for a new trial. Thank you for your time. Thank you, Mr. Osler. Mr. Oster? May it please the Court? Counsel? The defendant argues that the trial judge erred in denying his motion to suppress statements. The defendant was subject, of course, of the ongoing Federal Abuse Immunity Agreement when he participated in the murder of Shannon Elmore and the attempted murder of Jamerrill Linwood on October 10, 2011. The Federal Agreement, which the defendant had earlier signed on March 14, 2011, specifically stated that the Abuse Immunity Agreement would be void if the defendant committed any unauthorized criminal act while the agreement was in force. In our Federal Rule of Criminal Procedure 35B1, it says that generally the agreement is good for one year. The Federal Agreement, excuse me, the defendant's sign contains the language, quote, I have read this letter entirely and I understand and completely agree to the above terms, end quote. The Federal Agreement is in here in the appendix of the People's Brief, and you can see from that agreement that it only involves the U.S. government. At the motion hearing, the defendant did not put on evidence that his participation in the murder and attempted murder had been authorized by any authority under paragraph 7 of that agreement. And the defendant's own attorney argued that the Abuse Immunity Agreement was in force when the crimes were committed. Therefore, the defendant violated the Federal Abuse Immunity Agreement, and by its own terms it became void at that time. Nothing in the Federal Agreement informed the defendant that a federal judge had to determine whether the agreement had been breached by the Defendant's Commission of a Crime. And pursuant to Federal case law, the defendant may be indicted for a crime committed during the term of the agreement before the judicial determination is made. In his main brief, the defendant asserts that he did not understand the Miranda warnings read to him by Detective Curry because he believed his statements about the murder could not be used against him due to the Federal Abuse Immunity Agreement. What about the statement that Agent Hoffman makes in response to his question? Isn't that really what is problematic here for the state? Which statement are you referring to? When he says, is this going to hurt me? And he says, well, you're going to have to tell him the same thing. Well, there are some differences in the testimony about what the defendant actually said in the hallway that Agent Hoffman heard. Hoffman made two different statements in his testimony, one that he implicated himself, and another he denied that the defendant had made any statements that he was an accessory to the murder. So we've got those conflicting statements. We also have, at trial later, the defendant's own attorney, the federal attorney, Lonergan, said the defendant did not implicate himself in that hallway conversation where he was present and Hoffman was present. Right. I'm talking about when he asks him in the presence of the Peoria police officer, Curry, prior to the questioning beginning. Right. Well, I understand that. What I'm saying is that Hoffman could not have known that the defendant was going to implicate himself as a party to the murder. And Detective Curry said whatever information he had gotten from Agent Hoffman was not enough to charge the defendant. So obviously, he did not have clear information that the defendant was actually involved as a party to the murder at that time. So then Hoffman making that statement would not have necessarily said, yes, tell him that you participated in the murder, because we don't have any information that was exactly what the defendant told Hoffman in the hallway. And his own attorney said that he didn't say that. Defendant's statements about the murder were not compelled. And the defendant did not have any transactional immunity, so he's not immune from prosecution for murder. And he believes that the defendant may have had that the Federal Use of Immunity Agreement was enforced and protected against an Illinois charge that was unreasonable, where he clearly violated paragraph 7 of the agreement and under paragraph 10, the Federal Agreement was then void. Further, as we've heard, Federal Agreements do not bind states and vice versa. Well, are you aware of any case, state or federal, that says that a person can enter a Use of Immunity Agreement with law enforcement, state, federal, whatever, and then go out, and after entering that agreement, commit a crime, and that that immunity agreement protects them from prosecution of that crime? Not under the Use of Immunity Agreement, no, Your Honor. I've never encountered any case that allows you to violate the terms of Use of Immunity and then be immune from prosecution. Transactional immunity, of course, is a different thing, and you can be immune, but not under Use of Immunity. Do you think it would be a real bad idea, even if that wasn't in the terms, a real bad idea to let law enforcement enter Use of Immunity Agreements that says, by the way, you're not only immune from any crime you've committed up to this point, but anything you commit in the future? Well, certainly that would be against public policy, because it gives them free reign to go out and commit crimes. So that would not be a good policy to have. I'll take bad ideas for a thousand. I mean, it's like, that would be a horrible notion, wouldn't it? I agree with you, Your Honor, completely. And that being said, since there is no, I mean, the federal proffer doesn't buy in the state at all. No, it does not. Right. So, I mean, when Mr. Toussaint says to Hoffman, is this going to hurt me, he had to know that there was no immunity when he spoke to Peoria. Of course. He only had federal immunity, and it was only federal use immunity. He had no agreement with the state whatsoever. In fact, his attorney later testified that he didn't try to get a state agreement. I mean, the statement where you're going to have to tell him everything, that wouldn't be very reasonable for him to think that the defendant is not going to believe that that proffer is going to operate. I mean, he knows there's no immunity here. And somebody says, is this going to hurt me? He said, well, I don't know. You have to tell him what you know. I mean, he knows that there is no immunity. Hoffman knows that. I believe Hoffman probably would have known it at that time. Well, he should. It depends on the level of the information that the defendant had given to Hoffman and his attorney at the federal courthouse. I don't think the level of information matters if you're going to talk to a state agent about any kind of a crime. Well, no, the immunity agreement doesn't work at the state level. Well, if he didn't implicate himself, Your Honor, then there would have been no problem for the defendant whatsoever. He could have given all the information he had about the crime as long as he didn't, you know, at that time, nobody knew that he participated in the crime. So it couldn't have harmed him if he hadn't participated. They also didn't know if his information was going to be true or not. You think the statement is more about is this information hurtful to me rather than he's not asking about his immunity agreement? Right. Right. I see. Well, even if, I mean, the law is clear, I think, correct me if I'm wrong, even if the police officer or the agent lies to the defendant, that doesn't make the confession involuntary. Correct. I mean, if he'll just tell the truth, son, everything will be okay, that doesn't make the confession involuntary. That's correct, Your Honor. There's a considerable body of case law in that particular area. We don't have it cited today, but yes, you're correct on that. And we have to remember, the defendant was not in custody. He was totally voluntary, and Detective Curry read his Miranda rights. He'd already been Mirandized in the federal case earlier. And at that time, Curry told the defendant, the state works differently than the federal government, and for that reason, Curry had to read the defendant's rights. So he was on notice that the federal agreement did not apply to any potential state charges. Now, the defendant relies on Arkenbauer, says there was a continuity of agents in this case. Arkenbauer is distinguishable because it involved two state of Illinois actors who promised Arkenbauer would not be prosecuted if he cooperated with the state's attorneys and police. Here, no state agent promised the defendant anything. The defendant relies on the fact that the defendant's initial conversation with Agent Hoffman regarded the same murder that the defendant later spoke with Detective Curry about. But as mentioned earlier, Hoffman testified in two ways. One, that he implicated himself. One, that he did not implicate himself. His attorney said no, it did not happen in the hallway, he did not implicate himself. And Curry said he didn't know exactly what was going to happen. He didn't have enough information to charge him at that time. Now, Agent Hoffman was only involved in the Peoria Police Department interview because he knew how to contact the defendant. And he drove the defendant to the Peoria Police Department because Detective Curry did not want the appearance of impropriety. But Hoffman did not speak with the defendant about this case while he drove him to the Peoria Police Department. So there was no conversation at that time about any murders or anything. After the defendant was Mirandized, but before the interview with Peoria officers started, Hoffman left the room and Curry told the defendant that Agent Hoffman was gone for the day. So there's no continuity of agents here and Arkenbauer is not applicable to the facts of this case. Also, we have the last minute addition of a Stepinski case that came out recently. Stepinski court said, quote, Cooperation agreements are neither plea agreements nor a grant of immunity. They arise when the state agrees to limit a prosecution in some manner in consideration of the defendant's cooperation. Now, in Stepinski, there was a clear agreement with a police officer,  if you do the deal and we get these two drug dealers, we are not pressing charges. He did the deal. He didn't do further cooperation because he was then considered a rat in the agent. People were saying he knew that he had set up these two dealers so he couldn't provide any more information in the future. That next part of the deal was that they would make his earlier conviction for a drug possession in college go away somehow. But the court found that there was a cooperation agreement in force and that his due process rights had been violated when they later charged him when they said they wouldn't. And we don't have a cooperation agreement here at all. Well, like Arkenbauer, Stepinski involved an offense that took place before the immunity agreement was entered into. And yes, that's correct. So the defendant actually had a potential charge before the agreement was even reached. But the agreement itself specifically said, we're not going to charge you if you do what we ask you to do. And he did it. He did the agreement. They later charged him anyway. And so the court said that was a violation of due process. We don't have that situation here. People ask that this court find that the trial judge did not err in denying the defendant's motion to express. Do we have any more questions? Thank you, Mr. Hostel. Thank you. Mr. Walker for reply. Yes, just a brief reply. Your Honors, we'd like to stress again in response to the state's argument that there needs to be a judicial determination of a breach. The government does not unilaterally decide that there has been a breach of the agreement. And given the totality of the circumstances, as we've argued, Mr. Sussman did have a reasonable belief that he was immune. As to... Well, so again, so until the feds or somebody gets to court to say this fellow's breached the agreement, he's immune for any crime he commits after the entry of the use agreement or after entering into this use immunity agreement? Well, until there is a breach, Your Honor, the protections of any agreement the defendant would have been in are in effect. So until that breach has been determined, it's improper to find that, well, he committed this crime, we believe he did, so the agreement is void. And in fact, I believe Police Officer Perry testified the reason he spoke with the defendant was because the state's attorney told him, oh, don't worry, the federal agreement is void now because he committed this crime. Well, he hadn't even been adjudicated of guilt yet. He wasn't even charged with the crime at that point. So the government does not unilaterally decide that... Well, I understand, but all that was later embedded in the motion to suppress, right? Well, but ultimately, Your Honors, the main point is that until there is that determination that an agreement has been breached, all the protections of that agreement are in effect. Now, we've noted that the federal agreement didn't bind the state. But again, it's the totality of the circumstances, which we won't go over the factors again, but those are present. As for it being similar to a police officer lying, and we understand your point, but that's not the same thing as a police officer actively urging a defendant to speak, knowing that the defendant may have incriminated himself while a use immunity agreement is in effect. So simply without an agreement being in place and an officer saying, oh, come on, tell us this or that, that's different than that police officer understanding that there's a use immunity agreement in effect and still in response to a clear expression of doubt, expression of immunity, regarding the Mirandizing, replying, ah, yes, get the full story like you told me. That is not simply responding to someone. That's responding to somebody who has an immunity agreement in effect. And we also want to point out, because the state gets into the technicalities of the agreement, and we understand that, but, you know, in Arkbauer, the defendant was wrong about his agreement. He thought he had full transactional immunity. He didn't. He had a promise not to be prosecuted, and the court found there that the Shelby County state's attorney certainly could have prosecuted him. They just couldn't use those statements because they were involuntary. So with those points, Your Honor, if there's not any more questions, we'll just reiterate our request for relief, and that is that the trial court's denial of motions suppressed be reversed, that his charges be reversed, and that we're manned for a new trial. Thank you for your time. Thank you. Mr. Walker, thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible. Right now, we'll stand at brief recess until 8.15.